1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

**EASTERN DIVISION**

11
12
13
14
15
16
17

| | |
|---|---|
| GEORGINA PALACIOS, ) | No. EDCV 10-1743 AJW |
| ) | |
| Plaintiff, ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

Plaintiff filed this action seeking reversal of the decision of defendant Commissioner of

18

Social Security (the "Commissioner") denying in part plaintiff's application for Supplemental

19

Security Income ("SSI") benefits.  The parties have filed a Joint Stipulation ("JS") setting forth

20

their contentions with respect to each disputed issue.

21

**Administrative Proceedings**

22

The parties are familiar with the procedural facts, which are summarized in the joint

23

stipulation. [See JS 2-3]. In a written hearing decision that constitutes the Commissioner's final

24

decision in this case, an administrative law judge (the "ALJ") concluded that plaintiff was disabled

25

for a closed period from April 3, 2007 through May 14, 2009.  The ALJ determined that as of May

26

15, 2009, medical improvement related to plaintiff's ability to work had occurred.  The ALJ found

27

that as of that date, plaintiff had the residual functional capacity ("RFC") for light work, provided

28

that she could alternate between sitting and standing every 60 minutes; did not need to kneel,

1    crawl, reach overhead bilaterally, or climb ramps, stairs, scaffolds, or ropes; or do more than

2    frequent fingering and handling bilaterally. [JS 3; Administrative Record ("AR") 15]. The ALJ

3    concluded that plaintiff was not disabled beginning on May 15, 2009 because her RFC on and after

4    that date did not preclude her from performing her past relevant work as a fast food worker. [JS

5    3; AR 18].

6                                      **Standard of Review**

7          The Commissioner's denial of benefits should be disturbed only if it is not supported by

8    substantial evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d

9    1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial

10   evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart,

11   427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might

12   accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir.

13   2005)(internal quotation marks omitted). The court is required to review the record as a whole and

14   to consider evidence detracting from the decision as well as evidence supporting the decision.

15   Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d

16   1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational

17   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

18   Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th

19   Cir.1999)).

20                                          **Discussion**

21           **Medical improvement standard**

22          Once a claimant is found disabled under the Social Security Act, a presumption of

23   continuing disability arises that affects the burden of production. See Bellamy v. Sec'y of Health

24   & Human Servs., 755 F.2d 1380, 1381 (9th Cir. 1985); Mendoza v. Barnhart, 436 F.Supp.2d 1110,

25   1113 (C.D. Cal. 2000). Although the claimant retains the burden of persuasion, the presumption

26   of continuing disability shifts to the Commissioner the burden to come forward with evidence to

27   meet or rebut the presumption. See Bellamy, 755 F.2d at 1381. Benefits cannot be terminated

28   unless substantial evidence demonstrates medical improvement in the claimant's impairment such

                                            - 2 -

that the claimant is able to engage in substantial gainful activity.  See 42 U.S.C. § 423(f); Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983); see also 20 C.F.R. §§ 404.1594(a), 416.994(b). "The medical improvement standard applies to cases, such as here, involving a closed period of disability." Mendoza v. Apfel, 88 F.Supp.2d  1108, 1113 (C.D. Cal. 2000) (citing Shepherd v. Apfel, 184 F.3d 1196, 1200 (10th Cir. 1999); Jones v. Shalala, 10 F.3d 522, 524 (7th Cir.1993); Pickett v. Bowen, 833 F.2d 288 (9th Cir. 1987)).

"Medical improvement" is defined as

any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528).

20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

Defendant contends that Bellamy has been "conclusively overruled by statutory amendment," and that the Commissioner does not have the burden of rebutting a presumption of continuing disability. [JS 23].  Defendant argues that the Social Security Disability Benefits Reform Act of 1984 ("Reform Act"), Pub. L. No. 98-460, 98 Stat. 1794 (effective October 9, 1984) amended  42 U.S.C. section 423(f), which governs the termination of disability benefits, to provide that "[a]ny determination made under this section shall be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." [JS 23]. .

In the circumstances of this case, defendant's argument lacks merit. Bellamy was decided after the statutory amendment that defendant claims abrogated it.  Bellamy also has not been overruled or called into question by a decision of the Ninth Circuit or the United States Supreme Court.  Notwithstanding the 1984 amendment of section 423(f), the Ninth Circuit and district courts within this circuit have continued to cite Bellamy for the proposition that a presumption of continuing disability applies when the Commissioner seeks to terminate disability benefits based

1    on medical improvement . See, e.g., Parra v. Astrue, 481 F.3d 742, 748 (9th Cir. 2007); Mendoza,

2    436 F.Supp.2d at 1113; Nunn v. Astrue, 2011 WL 1361551, at *2 (C.D. Cal. Apr. 11, 2011).

3          Furthermore, the presumption of continuing disability does not create a substantive

4    "inference" of continuing disability.  Instead, it is an evidentiary presumption affecting the burden

5    of production. When a presumption of continuing disability exists,

6          the burden is still on [the claimant] to prove her case. All the presumption does is

7          impose on the [Commissioner] a burden *to come forward with evidence that her*

8          *condition has changed*. Whether that burden has been met is a judgment to be

9          made initially by the [Commissioner], and that judgment cannot be overturned on

10          appeal if it meets the "substantial evidence" standard. But where . . . there is

11          essentially no evidence to support a conclusion that the claimant's condition has

12          changed, the substantial evidence standard has not been met.

13    Patti v. Schweiker, 669 F.2d 582, 587 (9th Cir. 1982) (italics added).

14          Defendant cited no case law supporting his contention that the Reform Act abrogated

15    Bellamy.  Nonetheless, there is some out-of-circuit authority for the proposition that a presumption

16    of continuing disability is inconsistent with the language of section 423(f).  See Cutlip v. Sec'y

17    of Health & Human Servs., 25 F.3d 284, 286 n.1 (6th Cir. 1994) (per curiam) (observing that Sixth

18    Circuit post-Reform Act decisions had continued to recognize the presumption without addressing

19    the "clear conflict" between such a presumption and the language of section 423(f), and holding

20    that the district court erred in applying a presumption of continuing disability); Rhoten v. Bowen,

21    854 F.2d 667, 669 (4th Cir. 1988) ("While section 423(f) provides that terminations must be based

22    on substantial evidence of medical improvement, it does not establish a presumption of continuing

23    disability.").

24          This court, of course, is bound by Ninth Circuit precedent.  Furthermore, other courts

25    outside this circuit have allocated the burden of proof in post-Reform Act cases under section

26    423(f) to the Commissioner, and have suggested that the Commissioner bears the burden of

27    production.  See Waters v. Barnhart, 276 F.3d 716, 717, 718-719 (5th Cir. 2002) (holding, in a

28    closed period case under section 423(f), that "the initial burden is on the government to show that

the claimant's disability has ended," and "the government must, in all relevant respects, prove that

the person is no longer disabled") (citing 42 U.S.C. § 423(f); Griego v. Sullivan, 940 F.2d 942,

943-944 (5th Cir. 1991) (per curiam)); Glenn v. Shalala, 21 F.3d 983, 987 & n.1 (10th Cir. 1994)

(concluding that the Commissioner's regulations implementing section 423(f) "recognize[] that

before termination of benefits, the [Commissioner] has the burden of showing that a claimant has

the ability to engage in substantial gainful activity," and rejecting the Commissioner's argument

that the burden is on the claimant to prove that she is unable to perform her past relevant work)

(citing 20 C.F.R. § 404.1594(b),(c)(3)(i)&(d)); Robbins v. Barnhart, 205 F.Supp.2d 1189, 1199

(D. Kan. 2002) (holding, in a closed period case, that "the Commissioner has the burden to prove

both (1) medical improvement relating to [the] claimant's ability to work, and (2) ability to engage

in substantial gainful activity")[1].

### Credibility assessment

Plaintiff argues that the ALJ's negative credibility assessment with respect to the period

beginning May 15, 2009 was legally erroneous and was not supported by substantial evidence in

---

[1]Robbins is illuminating. Although that case did not involve application of a presumption of continuing disability, the Commissioner's position in that case and this one are similar. In Robbins, the Commissioner argued that the language of 423(f) "requires a determination on a neutral basis," "eliminates any presumption that a recipient's disability continues," and places the same burden of proof on the claimant in a termination case or closed period case as in an initial determination, that is, the burden to prove that her severe, medically-determinable impairments preclude performance of her past relevant work. The plaintiff, on the other hand, argued that the "the statutory requirement of neutrality regarding plaintiff's prior condition and the preclusion of an inference therefrom does not negate the requirement for the Commissioner to show medical improvement nor place the burden on plaintiff to show no medical improvement or an inability to engage in substantial gainful activity." Robbins, 205 F.Supp.2d at 1196.

The court's thorough review of the "ambiguous" and "inconclusive" statutory language and legislative history, relevant decisional authority, and other factors led it to conclude, among other things, that a claimant's failure to come forward with evidence that medical improvement related to the ability to work had *not* occurred could not be the basis for finding a closed period or terminating benefits, and that "forcing the claimant to attempt to prove a negative"—the absence of medical improvement related to the ability to work—was "fraught with logical, practical, and evidentiary problems." Robbins, 205 F.Supp.2d at 1196, 1198-99. Those observations are consistent with applying an evidentiary presumption placing the burden on the Commissioner to come forward with evidence of a claimant's medical improvement and ability to engage in substantial gainful activity in order to find that the claimant's disability has ceased.

the record.

Plaintiff underwent a left carpal tunnel release surgery in May 2007. In July 2007, arthroscopic surgery was performed on plaintiff's right knee. In October 2007, she underwent a right carpal tunnel release surgery. A second arthroscopic surgery on plaintiff's right knee was conducted in June 2008. She underwent a total right knee replacement in August 2008, and a total left knee replacement in March 2009. [AR 12; JS 7].

The ALJ found that plaintiff had severe impairments in the form of status post bilateral knee replacement surgeries, carpal tunnel syndrome status post bilateral carpal tunnel repair surgeries, and obesity. [AR 12]. The ALJ further found that plaintiff had the following additional medically determinable impairments that were not severe: well-controlled diabetes; hypothyroidism controlled with medication; rare occurrences of asthma with exertion, controlled with use of an inhaler; a resolved episode of cellulitis in her left leg; and a mild visual impairment. [AR 13].

The ALJ characterized plaintiff's statements regarding her subjective symptoms during the closed period as "generally credible." He noted that during that period, she underwent a total of six surgeries involving pre- and post-surgical evaluation, medical care, physical therapy, and a recovery period "during which [she] experienced pain and limited mobility and functionality of the affected area." [AR 14].

During the March 2010 administrative hearing, plaintiff was represented by counsel and testified on her own behalf. Plaintiff testified that she had a good result from both carpal tunnel release surgeries. Her dominant right hand was "pretty good," although "not as strong" as it used to be. Plaintiff said that she was getting "a little bit of the carpal tunnel back" in both hands, but "nothing severe." [AR 31-32].

Plaintiff testified that her recovery from her left knee replacement surgery in March 2009 was difficult and painful. She used a walker for about three months before she was able to walk unassisted. [AR 27-28, 41]. She said that she had fallen about four times in the year following her left knee surgery because she had trouble navigating steps or curbs. [AR 33]. Plaintiff also mentioned having a painful lump on her right knee; however, her doctor had run tests and told her

1    "everything was fine." [AR 33-34].

2         Plaintiff testified that both knees tended to swell if she stood or sat for too long, or when

3    it was cold. [AR 35-36, 37-38]. Plaintiff said that she took Norco or Lorcet [AR 36], both of which

4    are brand names for the narcotic pain reliever hydrocodone with acetaminophen. [See JS 8 & n.1].

5    Plaintiff did not "tolerate [her medication] real good" because it made her "angry" and "sick to

6    [her] stomach." [AR 36].  Medication made her pain "subside[] a little bit," but did not take the

7    pain "completely away." [AR 36].

8         Plaintiff testified that she could stand for about an hour and a half at a time and sit for

9    about two hours at a time. [AR 37-38].  She said that she was uncomfortable when she had to get

10   up from a seated position.  [AR 37-38].  Asked if she could work an eight-hour day if she could

11   alternate sitting and standing, plaintiff said there was "no way" because of pain in her legs and her

12   back.  She added that if she used her hands "for any length of time," they would go numb. [AR 38-

13   39].     Plaintiff also said that she had low back pain that had started in approximately December

14   2008 and had been fairly steady since that time. [AR 39-40]. She reported that she had been

15   diagnosed with arthritis of the spine, and that her pain medication did not help her lumbar pain.

16   [AR 39-40].

17        Plaintiff gave her height as 5'4" and her weight as 225 pounds.  She acknowledged that her

18   doctors had told her to lose weight, but maintained that her thyroid disease made it harder to lose

19   weight. [AR 40-41, 45]. Plaintiff testified that she did not use a cane, could drive, and did not have

20   problems operating the foot pedals in a car. [AR 41].

21        Plaintiff said she had a "lesion" from arthritis on her right ankle that caused weakness,

22   along with swelling in that ankle due to her most recent fall.  She also testified that she had

23   diabetic neuropathy in her hands and legs. [AR 42-44].  Plaintiff said that she could walk a block

24   at a reasonable pace on a rough or uneven surface but that climbing, including stair-climbing, was

25   very hard. [AR 42].

26        Once a disability claimant produces evidence of an underlying physical or mental

27   impairment that is reasonably likely to be the source of his or her subjective symptoms, the

28   adjudicator is required to consider all subjective testimony as to the severity of the symptoms.

1    Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th

2    Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and

3    other symptoms are evaluated).   Although the ALJ may then disregard the subjective testimony

4    he considers not credible, he must provide specific, convincing reasons for doing so. Tonapetyan

5    v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001); see also Moisa, 367 F.3d at 885 (stating that in the

6    absence of evidence of malingering, an ALJ may not dismiss the subjective testimony of claimant

7    without providing "clear and convincing reasons").   The ALJ's credibility findings "must be

8    sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's

9    testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony."

10   Moisa, 367 F.3d at 885; see Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)

11   (enumerating factors that bear on the credibility of subjective complaints); Fair v. Bowen, 885

12   F.2d 597, 604 n.5 (9th Cir. 1989)(same).  If the ALJ's assessment of the claimant's testimony is

13   reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it.

14   Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

15           In assessing the severity of plaintiff's subjective symptoms following the closed period,

16   the ALJ permissibly considered "the lack of corroborating medical evidence documenting the

17   severity of [her] symptoms and pain testimony." [JS 9]. See Burch, 400 F.3d at 681 ("Although

18   lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor

19   that the ALJ can consider in his credibility analysis.").   The ALJ noted that the consultative

20   orthopedic examination conducted by Dr. Simmonds in January 2010 was "unremarkable.

21   [Plaintiff] had full strength throughout, full extension in both knees, forward flexion to 130

22   degrees in both knees[2], and no instability in her knees.  She [also] had substantial grip strength."

23   [AR 17 (footnote added); see AR 423-426].  Dr. Simmonds reported that plaintiff exhibited a mild

24   right antalgic gait, but was able to heel and toe walk, and she moved freely around the office and

25   _____

26           [2]The range of motion for flexion of the knee joint is from 0 to 130 degrees.  The Merck
     Manual of Diagnosis and Therapy, online version for Health Care Professionals,, Special
27   Subjects, Rehabilitation, Physical Therapy, Table 1, available at
     http://www.merckmanuals.com/professional/special_subjects/rehabilitation/physical_therapy
28   _pt.html (last accessed Feb. 16, 2012).

1    examination room. [AR 424-425]. Her cervical and thoracolumbar spine examination was normal.

2    Straight-leg raising test was negative.  Her upper extremities were unremarkable.  Plaintiff had

3    "terminal pain" on flexion of both knees, and tenderness on palpation on her right knee.  Also

4    noted was a "raised soft tissue mass" on the right knee adjacent to the incision site, "likely a

5    reactive scar tissue." [AR 425].  No gross instability or neurovascular irregularities in the joints

6    were noted.  Anterior drawer sign[3] was negative.  Plaintiff's neurologic examination was normal

7    throughout. [AR 425-426].

8         The ALJ rationally concluded that because Dr. Simmons examined plaintiff "several

9    months after her most recent surgery and after she completed her post-surgical recovery period"

10   and was an orthopedic surgeon, his examination findings significantly undermined plaintiff's

11   subjective allegations of disabling pain and other symptoms. The ALJ also observed that the

12   treatment reports in the record pertaining to the period beginning May 15, 2009 did not

13   corroborate plaintiff's subjective complaints of disabling symptoms in her knees, legs, or hands.

14   Those reports consistently stated that plaintiff had normal musculoskeletal findings.[See AR 784,

15   788, 792, 795]. See Pelletier v. Astrue, 2012 WL 135992, at * 6 (D. Ariz. Jan. 18, 2012) (holding

16   that the ALJ stated clear and convincing reasons for rejecting the plaintiff's subjective testimony

17   where examination findings indicated that the plaintiff's knee replacement was "largely

18   successful," notwithstanding some residual knee pain, stiffness, and tenderness and the plaintiff's

19   continued use of pain medication; the plaintiff was ambulatory; and there was no evidence of post-

20   surgical problems with the replacement knee components).

21        Contrary to plaintiff's assertion, the ALJ did not base his credibility finding solely on the

22   absence of medical evidence corroborating the alleged severity of her subjective complaints.  The

23   ALJ also took into account Dr. Simmonds' opinion that plaintiff was not precluded from

24   performing a range of light work, and the absence of any conflicting treating source opinion. [AR

25

26

27        [3] A positive anterior drawer sign indicates that mobility of the knee joint is excessive and is significant for an injury of the medial capsule of the joint.  See 2 Dan J. Tennenhouse, M.D.,

28   J.D., F.C.L.M., Attorneys' Medical Deskbook § 18:4 (4th ed. database updated October 2011).

1    17, 426].  See Light, 119 F.3d at 792 (stating that in weighing a claimant's credibility, the ALJ

2    may consider testimony from physicians concerning the functional effect of a claimant's subjective

3    symptoms); Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (holding that the ALJ properly

4    rejected the claimant's pain testimony based, in part, on an examining physician's opinion that the

5    claimant was not disabled).

6         Giving some weight to plaintiff's testimony about her residual symptoms, and noting that

7    Dr. Simmonds had not been "asked to perform a thorough evaluation of [plaintiff's] carpal tunnel

8    syndrome or her shoulder impairment," the ALJ restricted plaintiff's RFC somewhat more than

9    either Dr. Simmonds or the nonexamining physicians by including postural and manipulative

10   limitations. [AR 15, 17].

11        The ALJ also observed that plaintiff's treatment reports for the period after her March 2009

12   surgery did not reflect subjective complaints of the severity she described in her testimony, or her

13   alleged falls after the end of the closed period. [See AR 17].  Progress reports in the record

14   indicate that plaintiff saw her treating doctors on five occasions between May 4, 2009 and January

15   22, 2010.[4]  [AR 782-800]. According to the progress notes, plaintiff's "reason for visit" or "chief

16   complaint" during those visits was follow-up treatment for lower left leg cellulitis, for which

17   plaintiff was prescribed antibiotics (May 4, 2009); treatment of a "dark nodular lesion" on her

18   right ankle, resulting in a referral to a podiatrist for excision (July 28, 2009); and treatment for

19   diabetes mellitus after plaintiff was hospitalized for out-of-control blood sugar levels (October 6

20   and 14, 2009; January 22, 2010).  Plaintiff's blood sugar levels were brought back under control

21   and were "running well" by January 22, 2010. [AR 783].  None of those progress notes indicate

22   that plaintiff presented using a walker or other assistive device. [See AR 783-800].

23        The ALJ was entitled to draw a negative inference from the inconsistency between

24   plaintiff's testimony regarding disabling pain, swelling, and tenderness during this period and the

25   description of her subjective complaints in contemporaneous treatment reports.  See Greger v.

26   Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) (holding that the ALJ properly rejected the alleged

27

28
_____

         [4]Plaintiff was incarcerated for two months during this period. [See AR 783, 787, 789].

severity of the claimant's symptoms based in part on his failure to report any shortness of breath, chest pain, or problems related to carpal tunnel syndrome to his doctors).

The ALJ provided clear and convincing reasons for rejecting the alleged severity of plaintiff's subjective complaints with respect to the period beginning on May 15, 2009. Accordingly, plaintiff's contentions are without merit.

**RFC assessment–handling and fingering**

Plaintiff argues that the ALJ's finding that plaintiff that plaintiff had limitations in handling and fingering was erroneous because the ALJ "did not assess the severity" of that restriction, and because no medical source imposed such a restriction.

The ALJ's RFC finding states that plaintiff is limited to "frequent" handling and fingering bilaterally, and the ALJ incorporated that limitation into a hypothetical question to the vocational expert. [AR 15, 47-48]. Therefore, neither his RFC finding nor his hypothetical question was incomplete or ambiguous in that respect.

Plaintiff's argument that the ALJ erred because he included in his RFC finding a functional limitation found in no medical source opinion is misguided. If that were the rule, the ALJ could never credit "excess" symptom testimony unless a medical source first credited that testimony and incorporated the limitation in question into a medical opinion. See Light, 119 F.3d at 792 ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.") (quoting Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986)); Fair, 885 F.2d at 602 ("The ALJ's assessment of the claimant's credibility thus becomes exceptionally important in excess pain cases; unlike ordinary Social Security cases, which involve a weighing of medical evidence from a variety of sources, excess pain cases often hinge entirely on whether or not the claimant's description of what he is feeling is believed."). The rule advocated by plaintiff would have barred the ALJ from finding plaintiff disabled during the closed period because the only medical source opinions of record were those of nonexamining state agency physicians, who concluded that plaintiff could perform a range of light work. In part, the ALJ concluded that plaintiff was disabled during the closed period because he credited her "excess" symptom complaints.

Dr. Simmonds took a subjective history and examined plaintiff after the end of the closed

period.  He found no objective or clinical abnormalities that would warrant a restriction in handling or fingering, and he included no such limitation in his functional assessment. [AR 423-426].  The treatment records post-dating the closed period did not contain any medical source opinion reflecting such a limitation.  Nonetheless, the ALJ was entitled to credit some of plaintiff's "excess" symptom testimony, and on that basis restrict plaintiff's RFC in ways that Dr. Simmonds did not.  The ALJ did not err in this regard.

### Medical improvement

Plaintiff argues that the ALJ's finding of medical improvement is not supported by substantial evidence in the record.

The ALJ found that medical improvement occurred as of May 15, 2009 because: (1) plaintiff had not required any further surgeries since her left knee replacement surgery in March 2009; (2) plaintiff had not needed to use an assistive device to ambulate since her recovery from that surgery; and (3) treatment records documented improvement in her strength and range of motion in her knees as of that date. [AR 15].

A finding of medical improvement must be based on a decrease in the medical severity of plaintiff's impairments as of May 15, 2009 as reflected in improvement in the symptoms, signs or laboratory findings associated with plaintiff's impairments. See 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). The ALJ's disability finding was based on nature, number, and proximity of plaintiff's surgeries during the closed period and the credible functional limitations associated with her impairments and symptoms prior to surgery, during surgical treatment, and during her recovery periods.  Because plaintiff's disability during the closed period was based in significant part on her surgical history, the end of her surgical treatment in March 2009 and the absence of any additional surgeries  reflects an improvement in her medical signs and laboratory findings that supports the ALJ's finding of medical improvement. See Weirup v. Comm'r Soc. Sec. Admin., 249 Fed.Appx. 697, 698  (9th Cir. 2007) (holding that substantial evidence supported a finding of medical improvement where, among other things, the claimant had undergone several surgeries that were considered successful); Dewey v. Astrue, 2008 WL 1883959, at *1-*2 (D. Ariz. Apr. 25, 2008) (holding that the ALJ permissibly based a finding of medical improvement on evidence

that the claimant had sufficient time to recover from back surgery and was stable on medications for a heart condition).

Similarly, evidence that plaintiff had not needed an assistive device to ambulate since recovering from her most recent knee replacement surgery was indicative of a decrease in the severity of her post-surgical symptoms. Cf. McDonnall v. Astrue, 2009 WL 605798, at *1 (C.D. Cal. Mar. 6, 2009) (holding that evidence that a claimant whose left leg had been amputated could walk moderate distances on a prosthetic leg without an assistive device supported a finding of medical improvement).

Plaintiff's treatment notes from May 2009 through January 2010 also comprise substantial evidence supporting the ALJ's finding of medical improvement. As previously noted, beginning in May 2009, plaintiff's treatment providers documented normal musculoskeletal examination findings, with no significant subjective complaints related to her legs, hands, or wrists and no reports of continued use of an assistive device.

The ALJ pointed to evidence in the record showing that medical improvement related to the ability to work occurred as of May 15, 2009. Substantial evidence supports his finding that medical improvement occurred as of that date.

**Vocational expert testimony**

Plaintiff contends that the ALJ improperly relied on the vocational expert's testimony that a person who needed to change from sitting to standing every 60 minutes could perform plaintiff's past relevant work as a fast food worker. Plaintiff also contends that the ALJ did not properly resolve an apparent conflict between the vocational expert's testimony and information in the Dictionary of Occupational Titles ("DOT").

A claimant is "not disabled" if he retains the residual functional capacity to perform the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001) (quoting Social Security Ruling ("SSR") 82-62); see also Burch, 400 F.3d at 679; Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986) ("The claimant has the burden of proving an inability to return to his former

1   type of work and not just to his former job.").  Information in the DOT, or the testimony of a

2   vocational specialist, may be used to ascertain the demands of an occupation as ordinarily required

3   by employers throughout the national economy.  SSR 82-61, 1982 WL 31387, at *2; Villa, 797

4   F.2d at 798; cf. Maier v. Comm'r of the Social Sec. Admin., 154 F.3d 913, 915 (9th Cir. 1998)

5   (per curiam) (holding that the ALJ properly relied on expert testimony to deviate from the DOT

6   job classification at step five).  Regardless of which source of job information is used, the ALJ is

7   required to make "specific findings as to the claimant's residual functional capacity, the physical

8   and mental demands of the past relevant work, and the relation of the residual functional capacity

9   to the past work."  Pinto, 249 F.3d at 845 (citing SSR 82-62).

10          The ALJ posed a hypothetical question to the vocational expert positing an individual who,

11   among other things, "should be allowed to change positions between sitting and standing every

12   60 minutes . . . ." [AR 47].  The vocational expert initially testified that the need to change

13   positions every 60 minutes would preclude performance of plaintiff's past relevant work as a fast

14   food worker, which she classified (in a written summary prepared before the hearing) as DOT job

15   number 311.472-010. [AR 46, 156].  The VE immediately changed her testimony, however.  She

16   explained that some fast food workers "works the window, and they do sit, they have the capacity

17   to sit. So I'm going to say that with eroded numbers . . . that position could be performed." [AR

18   48].  The vocational expert testified that the need to change positions would erode the occupational

19   base of 400 jobs regionally and 100,000 jobs nationally by 90%, meaning that the hypothetical

20   person could perform 10% of those jobs, that is, 10,000 jobs nationally.  The vocational expert

21   also testified that "there would be other work," but the ALJ did not ask her about other work. [AR

22   48-49].

23          The ALJ concluded that the vocational expert's testimony differed from information in the

24   DOT.  Citing a written statement in the record by the vocational expert explaining "[t]he reason

25   for the different or inconsistent testimony," the ALJ adopted the vocational expert's testimony on

26   the grounds that it was "reasonable and well-founded." [AR 18, 155].

27          Plaintiff portrays the vocational expert's testimony as ambiguous or unintelligible.  The

28   vocational expert's testimony was clear enough.  She testified that the hypothetical person could

perform the job of fast food worker with an erosion in the number of jobs available because of the need to be able to change positions every 60 minutes.  She testified that there were some jobs in which a fast food worker worked at a window and therefore could sit down, giving the hypothetical person the opportunity to change positions as posited by the ALJ in his hypothetical question and RFC finding.

During the hearing, the ALJ did not ask the vocational expert whether her testimony conflicted with information in the DOT. See  Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007) (holding that an ALJ must inquire whether a vocational expert's testimony conflicts with the DOT, must obtain an explanation from the vocational expert for any conflict, and must determine whether the explanation is reasonable and provides a basis for relying on the expert's testimony rather than the DOT). In her written statement, however, the vocational expert said that her testimony during the hearing departed from the DOT and its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") to the extent that she mentioned certain jobs are available that allow a "sit/stand option." She said that she "reduced or 'eroded'" the number of jobs available on account of including that option. She also indicated that the jobs she mentioned with the "sit/stand option" do not fall within any specific DOT job title and differed from plaintiff's past relevant work as she actually performed it. [AR 155].  Plaintiff's actual past work as a fast food worker was medium work, but the DOT defines the job as light work. [See AR 156].

The vocational expert next explained her reasons for departing from the DOT and the SCO as follows:

> The DOT and SCO were promulgated a number of years ago, and these publications have not been adequately revised or sufficiently updated to reflect subsequent changes in the labor market.  I have access to occupational and vocational information which is different from, more current than, or not even contained in, the DOT and the SCO.

[AR 155].

Plaintiff contends that the ALJ's explanation regarding the conflict between the vocational

expert's testimony and the DOT was "vague" and "did not cite the apparently inconsistent testimony," and that the ALJ did not secure or provide a reasonable explanation for the conflict.

Plaintiff's arguments lack merit.  The vocational expert's written statement is part of the record and specifies how and why her testimony departed from the DOT and the SCO.  The ALJ cited that analysis in his decision to support his adoption of the vocational expert's testimony; he did not need to repeat it verbatim.  The ALJ's decision also refers specifically to the conflicting testimony. [AR 18 ("The vocational expert testified that the requirement to alternate position between sitting and standing every 60 minutes would result in 90 percent erosion of the number of positions.")].

The vocational expert's stated reasons for deviating from the DOT and the SCO, moreover, were sufficient to justify the ALJ's reliance on her testimony.  Neither the <u>DOT</u> nor the vocational expert's testimony "automatically trumps when there is a conflict."  <u>Massachi</u>, 486 F.3d at 1153 (footnote omitted). Examples of reasonable explanations for deviation are that the DOT "does not provide information about *all* occupations, information about a particular job not listed in the [DOT] may be available elsewhere, and the general descriptions in the [DOT] may not apply to specific situations."  <u>Massachi</u>, 486 F.3d at 1153 n. 17 (citing SSR 00-4p, at *2-*3).  Under <u>Massachi</u>, the ALJ was entitled to rely on the vocational expert's testimony, and he adequately articulated the basis for his decision.

### Conclusion

For the reasons described above, the Commissioner's decision is supported by substantial evidence and free of legal error.  Therefore, the Commissioner's decision is **affirmed.**

**IT IS SO ORDERED**

February 23, 2012



_____
ANDREW J. WISTRICH
United States Magistrate Judge